(Slip Opinion)        OCTOBER TERM, 2008        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CAPERTON ET AL. *v.* A. T. MASSEY COAL CO., INC., ET AL.

### CERTIORARI TO THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

No. 08–22.   Argued March 3, 2009—Decided June 8, 2009

After a West Virginia jury found respondents, a coal company and its affiliates (hereinafter Massey), liable for fraudulent misrepresentation, concealment, and tortious interference with existing contractual relations and awarded petitioners (hereinafter Caperton) $50 million in damages, West Virginia held its 2004 judicial elections. Knowing the State Supreme Court of Appeals would consider the appeal, Don Blankenship, Massey's chairman and principal officer, supported Brent Benjamin rather than the incumbent justice seeking reelection. His $3 million in contributions exceeded the total amount spent by all other Benjamin supporters and by Benjamin's own committee. Benjamin won by fewer than 50,000 votes. Before Massey filed its appeal, Caperton moved to disqualify now-Justice Benjamin under the Due Process Clause and the State's Code of Judicial Conduct, based on the conflict caused by Blankenship's campaign involvement. Justice Benjamin denied the motion, indicating that he found nothing showing bias for or against any litigant. The court then reversed the $50 million verdict. During the rehearing process, Justice Benjamin refused twice more to recuse himself, and the court once again reversed the jury verdict. Four months later, Justice Benjamin filed a concurring opinion, defending the court's opinion and his recusal decision.

*Held:* In all the circumstances of this case, due process requires recusal. Pp. 6–20.

  (a) The Due Process Clause incorporated the common-law rule requiring recusal when a judge has "a direct, personal, substantial, pecuniary interest" in a case, *Tumey* v. *Ohio*, 273 U. S. 510, 523, but this Court has also identified additional instances which, as an objec-

tive matter, require recusal where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable," *Withrow* v. *Larkin*, 421 U. S. 35, 47. Two such instances place the present case in proper context. Pp. 6–11.

(1) The first involved local tribunals in which a judge had a financial interest in a case's outcome that was less than what would have been considered personal or direct at common law. In *Tumey,* a village mayor with authority to try those accused of violating a law prohibiting the possession of alcoholic beverages faced two potential conflicts: Because he received a salary supplement for performing judicial duties that was funded from the fines assessed, he received a supplement only upon a conviction; and sums from the fines were deposited to the village's general treasury fund for village improvements and repairs. Disqualification was required under the principle that "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." 273 U. S., at 532. In *Ward* v. *Monroeville*, 409 U. S. 57, a conviction in another mayor's court was invalidated even though the fines assessed went only to the town's general fisc, because the mayor faced a "'possible temptation'" created by his "executive responsibilities for village finances." *Id.,* at 60. Recusal was also required where an Alabama Supreme Court justice cast the deciding vote upholding a punitive damages award while he was the lead plaintiff in a nearly identical suit pending in Alabama's lower courts. *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813. The proper constitutional inquiry was not "whether in fact [the justice] was influenced," *id.*, at 825, but "whether sitting on [that] case . . . ' "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true," ' " *ibid.* While the "degree or kind of interest . . . sufficient to disqualify a judge . . . '[could not] be defined with precision, ' " *id.,* at 822, the test did have an objective component. Pp. 7–9.

(2) The second instance emerged in the criminal contempt context, where a judge had no pecuniary interest in the case but had determined in an earlier proceeding whether criminal charges should be brought and then proceeded to try and convict the petitioners. *In re Murchison*, 349 U. S. 133. Finding that "no man can be a judge in his own case," and "no man is permitted to try cases where he has an interest in the outcome," *id.*, at 136, the Court noted that the circumstances of the case and the prior relationship required recusal. The judge's prior relationship with the defendant, as well as the information acquired from the prior proceeding, was critical. In reiterating

that the rule that "a defendant in criminal contempt proceedings should be [tried] before a judge other than the one reviled by the contemnor," *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 466, rests on the relationship between the judge and the defendant, *id.*, at 465, the Court noted that the objective inquiry is not whether the judge is actually biased, but whether the average judge in his position is likely to be neutral or there is an unconstitutional "'potential for bias,'" *id.,* at 466. Pp. 9–11.

(b) Because the objective standards implementing the Due Process Clause do not require proof of actual bias, this Court does not question Justice Benjamin's subjective findings of impartiality and propriety and need not determine whether there was actual bias. Rather, the question is whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow*, 421 U. S.*,* at 47. There is a serious risk of actual bias when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent. The proper inquiry centers on the contribution's relative size in comparison to the total amount contributed to the campaign, the total amount spent in the election, and the apparent effect of the contribution on the outcome. It is not whether the contributions were a necessary and sufficient cause of Benjamin's victory. In an election decided by fewer than 50,000 votes, Blankenship's campaign contributions—compared to the total amount contributed to the campaign, as well as the total amount spent in the election—had a significant and disproportionate influence on the outcome. And the risk that Blankenship's influence engendered actual bias is sufficiently substantial that it "must be forbidden if the guarantee of due process is to be adequately implemented." *Ibid.* The temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is also critical, for it was reasonably foreseeable that the pending case would be before the newly elected justice. There is no allegation of a *quid pro quo* agreement, but the extraordinary contributions were made at a time when Blankenship had a vested stake in the outcome. Just as no man is allowed to be a judge in his own cause, similar fears of bias can arise when—without the other parties' consent—a man chooses the judge in his own cause. Applying this principle to the judicial election process, there was here a serious, objective risk of actual bias that required Justice Benjamin's recusal. Pp. 11–16.

Syllabus

(c) Massey and its *amici* err in predicting that this decision will lead to adverse consequences ranging from a flood of recusal motions to unnecessary interference with judicial elections. They point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case, which are extreme by any measure. And because the States may have codes of conduct with more rigorous recusal standards than due process requires, most recusal disputes will be resolved without resort to the Constitution, making the constitutional standard's application rare. Pp. 16–20.

___ W. Va. ___, ___S. E. 2d ___, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, THOMAS, and ALITO, JJ., joined. SCALIA, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–22

## HUGH M. CAPERTON, ET AL., PETITIONERS *v.* A. T. MASSEY COAL COMPANY, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

[June 8, 2009]

JUSTICE KENNEDY delivered the opinion of the Court.

In this case the Supreme Court of Appeals of West Virginia reversed a trial court judgment, which had entered a jury verdict of $50 million. Five justices heard the case, and the vote to reverse was 3 to 2. The question presented is whether the Due Process Clause of the Fourteenth Amendment was violated when one of the justices in the majority denied a recusal motion. The basis for the motion was that the justice had received campaign contributions in an extraordinary amount from, and through the efforts of, the board chairman and principal officer of the corporation found liable for the damages.

Under our precedents there are objective standards that require recusal when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow* v. *Larkin*, 421 U. S. 35, 47 (1975). Applying those precedents, we find that, in all the circumstances of this case, due process requires recusal.

## I

In August 2002 a West Virginia jury returned a verdict that found respondents A. T. Massey Coal Co. and its

affiliates (hereinafter Massey) liable for fraudulent misrepresentation, concealment, and tortious interference with existing contractual relations. The jury awarded petitioners Hugh Caperton, Harman Development Corp., Harman Mining Corp., and Sovereign Coal Sales (hereinafter Caperton) the sum of $50 million in compensatory and punitive damages.

In June 2004 the state trial court denied Massey's posttrial motions challenging the verdict and the damages award, finding that Massey "intentionally acted in utter disregard of [Caperton's] rights and ultimately destroyed [Caperton's] businesses because, after conducting cost-benefit analyses, [Massey] concluded it was in its financial interest to do so." App. 32a, ¶10(p). In March 2005 the trial court denied Massey's motion for judgment as a matter of law.

Don Blankenship is Massey's chairman, chief executive officer, and president. After the verdict but before the appeal, West Virginia held its 2004 judicial elections. Knowing the Supreme Court of Appeals of West Virginia would consider the appeal in the case, Blankenship decided to support an attorney who sought to replace Justice McGraw. Justice McGraw was a candidate for reelection to that court. The attorney who sought to replace him was Brent Benjamin.

In addition to contributing the $1,000 statutory maximum to Benjamin's campaign committee, Blankenship donated almost $2.5 million to "And For The Sake Of The Kids," a political organization formed under 26 U. S. C. §527. The §527 organization opposed McGraw and supported Benjamin. App. 672a–673a. Blankenship's donations accounted for more than two-thirds of the total funds it raised. *Id.,* at 150a. This was not all. Blankenship spent, in addition, just over $500,000 on independent expenditures—for direct mailings and letters soliciting donations as well as television and newspaper advertise-

ments—"'to support . . . Brent Benjamin.'" *Id.,* at 184a, 186a, 200a (bold typeface omitted) (quoting Blankenship's state campaign financial disclosure filings).

To provide some perspective, Blankenship's $3 million in contributions were more than the total amount spent by all other Benjamin supporters and three times the amount spent by Benjamin's own committee. *Id.,* at 288a. Caperton contends that Blankenship spent $1 million more than the total amount spent by the campaign committees of both candidates combined. Brief for Petitioners 28.

Benjamin won. He received 382,036 votes (53.3%), and McGraw received 334,301 votes (46.7%). App. 677a.

In October 2005, before Massey filed its petition for appeal in West Virginia's highest court, Caperton moved to disqualify now-Justice Benjamin under the Due Process Clause and the West Virginia Code of Judicial Conduct, based on the conflict caused by Blankenship's campaign involvement. Justice Benjamin denied the motion in April 2006. He indicated that he "carefully considered the bases and accompanying exhibits proffered by the movants." But he found "no objective information . . . to show that this Justice has a bias for or against any litigant, that this Justice has prejudged the matters which comprise this litigation, or that this Justice will be anything but fair and impartial." *Id.,* at 336a–337a. In December 2006 Massey filed its petition for appeal to challenge the adverse jury verdict. The West Virginia Supreme Court of Appeals granted review.

In November 2007 that court reversed the $50 million verdict against Massey. The majority opinion, authored by then-Chief Justice Davis and joined by Justices Benjamin and Maynard, found that "Massey's conduct warranted the type of judgment rendered in this case." *Id.,* at 357a. It reversed, nevertheless, based on two independent grounds—first, that a forum-selection clause contained in a contract to which Massey was not a party barred the suit

in West Virginia, and, second, that res judicata barred the suit due to an out-of-state judgment to which Massey was not a party. *Id.,* at 345a. Justice Starcher dissented, stating that the "majority's opinion is morally and legally wrong." *Id.,* at 420a–422a. Justice Albright also dissented, accusing the majority of "misapplying the law and introducing sweeping 'new law' into our jurisprudence that may well come back to haunt us." *Id.,* at 430a–431a.

Caperton sought rehearing, and the parties moved for disqualification of three of the five justices who decided the appeal. Photos had surfaced of Justice Maynard vacationing with Blankenship in the French Riviera while the case was pending. *Id.,* at 440a–441a, 456a. Justice Maynard granted Caperton's recusal motion. On the other side Justice Starcher granted Massey's recusal motion, apparently based on his public criticism of Blankenship's role in the 2004 elections. In his recusal memorandum Justice Starcher urged Justice Benjamin to recuse himself as well. He noted that "Blankenship's bestowal of his personal wealth, political tactics, and 'friendship' have created a cancer in the affairs of this Court." *Id.,* at 459a–460a. Justice Benjamin declined Justice Starcher's suggestion and denied Caperton's recusal motion.

The court granted rehearing. Justice Benjamin, now in the capacity of acting chief justice, selected Judges Cookman and Fox to replace the recused justices. Caperton moved a third time for disqualification, arguing that Justice Benjamin had failed to apply the correct standard under West Virginia law—*i.e.*, whether "a reasonable and prudent person, knowing these objective facts, would harbor doubts about Justice Benjamin's ability to be fair and impartial." *Id.,* at 466a, ¶8. Caperton also included the results of a public opinion poll, which indicated that over 67% of West Virginians doubted Justice Benjamin would be fair and impartial. Justice Benjamin again refused to withdraw, noting that the "push poll" was "nei-

ther credible nor sufficiently reliable to serve as the basis for an elected judge's disqualification." *Id.,* at 483a.

In April 2008 a divided court again reversed the jury verdict, and again it was a 3-to-2 decision. Justice Davis filed a modified version of his prior opinion, repeating the two earlier holdings. She was joined by Justice Benjamin and Judge Fox. Justice Albright, joined by Judge Cookman, dissented: "Not only is the majority opinion unsupported by the facts and existing case law, but it is also fundamentally unfair. Sadly, justice was neither honored nor served by the majority." \_\_\_ W. Va. \_\_\_, \_\_\_, \_\_\_ S. E. 2d \_\_\_, \_\_\_; App. 633a. The dissent also noted "genuine due process implications arising under federal law" with respect to Justice Benjamin's failure to recuse himself. \_\_\_ W. Va., at \_\_\_, n. 16, \_\_\_ S. E. 2d, at \_\_\_, n. 16; App. 634a, n. 16 (citing *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813 (1986); *In re Murchison*, 349 U. S. 133, 136 (1955)).

Four months later—a month after the petition for writ of certiorari was filed in this Court—Justice Benjamin filed a concurring opinion. He defended the merits of the majority opinion as well as his decision not to recuse. He rejected Caperton's challenge to his participation in the case under both the Due Process Clause and West Virginia law. Justice Benjamin reiterated that he had no "'direct, personal, substantial, pecuniary interest' in this case.'" \_\_\_ W. Va., at \_\_\_, \_\_\_ S. E. 2d, at \_\_\_; App. 677a (quoting *Lavoie, supra*, at 822). Adopting "a standard merely of 'appearances,'" he concluded, "seems little more than an invitation to subject West Virginia's justice system to the vagaries of the day—a framework in which predictability and stability yield to supposition, innuendo, half-truths, and partisan manipulations." \_\_\_ W. Va., at \_\_\_, \_\_\_ S. E. 2d, at \_\_\_; App. 692a.

We granted certiorari. 555 U. S. \_\_\_ (2008).

## II

It is axiomatic that "[a] fair trial in a fair tribunal is a basic requirement of due process." *Murchison, supra,* at 136. As the Court has recognized, however, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC* v. *Cement Institute*, 333 U. S. 683, 702 (1948). The early and leading case on the subject is *Tumey* v. *Ohio,* 273 U. S. 510 (1927). There, the Court stated that "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." *Id.*, at 523.

The *Tumey* Court concluded that the Due Process Clause incorporated the common-law rule that a judge must recuse himself when he has "a direct, personal, substantial, pecuniary interest" in a case. *Ibid.* This rule reflects the maxim that "[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." The Federalist No. 10, p. 59 (J. Cooke ed. 1961) (J. Madison); see Frank, Disqualification of Judges, 56 Yale L. J. 605, 611–612 (1947) (same). Under this rule, "disqualification for bias or prejudice was not permitted"; those matters were left to statutes and judicial codes. *Lavoie, supra,* at 820; see also Part IV, *infra* (discussing judicial codes). Personal bias or prejudice "alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause." *Lavoie, supra*, at 820.

As new problems have emerged that were not discussed at common law, however, the Court has identified additional instances which, as an objective matter, require recusal. These are circumstances "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U. S., at 47. To place the present case in proper context, two instances where the Court has required recusal merit further discussion.

### A

The first involved the emergence of local tribunals where a judge had a financial interest in the outcome of a case, although the interest was less than what would have been considered personal or direct at common law.

This was the problem addressed in *Tumey*. There, the mayor of a village had the authority to sit as a judge (with no jury) to try those accused of violating a state law prohibiting the possession of alcoholic beverages. Inherent in this structure were two potential conflicts. First, the mayor received a salary supplement for performing judicial duties, and the funds for that compensation derived from the fines assessed in a case. No fines were assessed upon acquittal. The mayor-judge thus received a salary supplement only if he convicted the defendant. 273 U. S., at 520. Second, sums from the criminal fines were deposited to the village's general treasury fund for village improvements and repairs. *Id.*, at 522.

The Court held that the Due Process Clause required disqualification "both because of [the mayor-judge's] direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Id.*, at 535. It so held despite observing that "[t]here are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it." *Id.*, at 532. The Court articulated the controlling principle:

> "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Ibid.*

The Court was thus concerned with more than the traditional common-law prohibition on direct pecuniary inter-

est. It was also concerned with a more general concept of interests that tempt adjudicators to disregard neutrality.

This concern with conflicts resulting from financial incentives was elaborated in *Ward* v. *Monroeville*, 409 U. S. 57 (1972), which invalidated a conviction in another mayor's court. In *Monroeville*, unlike in *Tumey*, the mayor received no money; instead, the fines the mayor assessed went to the town's general fisc. The Court held that "[t]he fact that the mayor [in *Tumey*] shared directly in the fees and costs did not define the limits of the principle." 409 U. S., at 60. The principle, instead, turned on the "'possible temptation'" the mayor might face; the mayor's "executive responsibilities for village finances may make him partisan to maintain the high level of contribution [to those finances] from the mayor's court." *Ibid.* As the Court reiterated in another case that Term, "the [judge's] financial stake need not be as direct or positive as it appeared to be in *Tumey*." *Gibson* v. *Berryhill*, 411 U. S. 564, 579 (1973) (an administrative board composed of optometrists had a pecuniary interest of "sufficient substance" so that it could not preside over a hearing against competing optometrists).

The Court in *Lavoie* further clarified the reach of the Due Process Clause regarding a judge's financial interest in a case. There, a justice had cast the deciding vote on the Alabama Supreme Court to uphold a punitive damages award against an insurance company for bad-faith refusal to pay a claim. At the time of his vote, the justice was the lead plaintiff in a nearly identical lawsuit pending in Alabama's lower courts. His deciding vote, this Court surmised, "undoubtedly 'raised the stakes'" for the insurance defendant in the justice's suit. 475 U. S., at 823–824.

The Court stressed that it was "not required to decide whether in fact [the justice] was influenced." *Id.*, at 825. The proper constitutional inquiry is "whether sitting on the case then before the Supreme Court of Alabama

'"would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true."'" *Ibid.* (quoting *Monroeville*, *supra*, at 60, in turn quoting *Tumey*, *supra*, at 532). The Court underscored that "what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.'" 475 U. S., at 822 (quoting *Murchison*, 349 U. S., at 136). In the Court's view, however, it was important that the test have an objective component.

The *Lavoie* Court proceeded to distinguish the state court justice's particular interest in the case, which required recusal, from interests that were not a constitutional concern. For instance, "while [the other] justices might conceivably have had a slight pecuniary interest" due to their potential membership in a class-action suit against their own insurance companies, that interest is "'too remote and insubstantial to violate the constitutional constraints.'" 475 U. S., at 825–826 (quoting *Marshall* v. *Jerrico, Inc.*, 446 U. S. 238, 243 (1980)).

B

The second instance requiring recusal that was not discussed at common law emerged in the criminal contempt context, where a judge had no pecuniary interest in the case but was challenged because of a conflict arising from his participation in an earlier proceeding. This Court characterized that first proceeding (perhaps pejoratively) as a "'one-man grand jury.'" *Murchison*, 349 U. S., at 133.

In that first proceeding, and as provided by state law, a judge examined witnesses to determine whether criminal charges should be brought. The judge called the two petitioners before him. One petitioner answered questions, but the judge found him untruthful and charged him with perjury. The second declined to answer on the ground that he did not have counsel with him, as state law seemed to permit. The judge charged him with contempt.

The judge proceeded to try and convict both petitioners. *Id.*, at 134–135.

This Court set aside the convictions on grounds that the judge had a conflict of interest at the trial stage because of his earlier participation followed by his decision to charge them. The Due Process Clause required disqualification. The Court recited the general rule that "no man can be a judge in his own case," adding that "no man is permitted to try cases where he has an interest in the outcome." *Id.*, at 136. It noted that the disqualifying criteria "cannot be defined with precision. Circumstances and relationships must be considered." *Ibid.* These circumstances and the prior relationship required recusal: "Having been a part of [the one-man grand jury] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.*, at 137. That is because "[a]s a practical matter it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury' secret session." *Id.*, at 138.

The *Murchison* Court was careful to distinguish the circumstances and the relationship from those where the Constitution would not require recusal. It noted that the single-judge grand jury is "more a part of the accusatory process than an ordinary lay grand juror," and that "adjudication by a trial judge of a contempt committed in [a judge's] presence in open court cannot be likened to the proceedings here." *Id.*, at 137. The judge's prior relationship with the defendant, as well as the information acquired from the prior proceeding, was of critical import.

Following *Murchison* the Court held in *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 466 (1971), "that by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor." The Court reiterated that this rule rests on the relationship between the judge and the

defendant: "[A] judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." *Id.*, at 465.

Again, the Court considered the specific circumstances presented by the case. It noted that "not every attack on a judge . . . disqualifies him from sitting." *Ibid.* The Court distinguished the case from *Ungar* v. *Sarafite*, 376 U. S. 575 (1964), in which the Court had "ruled that a lawyer's challenge, though 'disruptive, recalcitrant and disagreeable commentary,' was still not 'an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification.'" *Mayberry*, *supra*, at 465–466 (quoting *Ungar*, *supra*, at 584). The inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias."

## III

Based on the principles described in these cases we turn to the issue before us. This problem arises in the context of judicial elections, a framework not presented in the precedents we have reviewed and discussed.

Caperton contends that Blankenship's pivotal role in getting Justice Benjamin elected created a constitutionally intolerable probability of actual bias. Though not a bribe or criminal influence, Justice Benjamin would nevertheless feel a debt of gratitude to Blankenship for his extraordinary efforts to get him elected. That temptation, Caperton claims, is as strong and inherent in human nature as was the conflict the Court confronted in *Tumey* and *Monroeville* when a mayor-judge (or the city) benefited financially from a defendant's conviction, as well as the conflict identified in *Murchison* and *Mayberry* when a

judge was the object of a defendant's contempt.

Justice Benjamin was careful to address the recusal motions and explain his reasons why, on his view of the controlling standard, disqualification was not in order. In four separate opinions issued during the course of the appeal, he explained why no actual bias had been established. He found no basis for recusal because Caperton failed to provide "objective evidence" or "objective information," but merely "subjective belief" of bias. ___ W. Va., at ___, ___–___, ___ S. E. 2d, at ___, ___–___; App. 336a, 337a–338a, 444a–445a. Nor could anyone "point to any actual conduct or activity on [his] part which could be termed 'improper.'" ___ W. Va., at ___–___, ___ S. E. 2d, at ___–___; App. 655a–656a. In other words, based on the facts presented by Caperton, Justice Benjamin conducted a probing search into his actual motives and inclinations; and he found none to be improper. We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias.

Following accepted principles of our legal tradition respecting the proper performance of judicial functions, judges often inquire into their subjective motives and purposes in the ordinary course of deciding a case. This does not mean the inquiry is a simple one. "The work of deciding cases goes on every day in hundreds of courts throughout the land. Any judge, one might suppose, would find it easy to describe the process which he had followed a thousand times and more. Nothing could be farther from the truth." B. Cardozo, The Nature of the Judicial Process 9 (1921).

The judge inquires into reasons that seem to be leading to a particular result. Precedent and *stare decisis* and the text and purpose of the law and the Constitution; logic and scholarship and experience and common sense; and fairness and disinterest and neutrality are among the factors at work. To bring coherence to the process, and to seek

respect for the resulting judgment, judges often explain the reasons for their conclusions and rulings. There are instances when the introspection that often attends this process may reveal that what the judge had assumed to be a proper, controlling factor is not the real one at work. If the judge discovers that some personal bias or improper consideration seems to be the actuating cause of the decision or to be an influence so difficult to dispel that there is a real possibility of undermining neutrality, the judge may think it necessary to consider withdrawing from the case.

The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real motives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review, though actual bias, if disclosed, no doubt would be grounds for appropriate relief. In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. See *Tumey*, 273 U. S., at 532; *Mayberry*, 400 U. S., at 465–466; *Lavoie*, 475 U. S., at 825. In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow*, 421 U. S., at 47.

We turn to the influence at issue in this case. Not every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal, but this is an exceptional case. Cf. *Mayberry*, *supra,* at 465 ("It is, of course, not every attack on a judge that disqualifies him from sitting"); *Lavoie*, *supra,* at 825–826 (some pecuniary

interests are "'too remote and insubstantial'"). We conclude that there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent. The inquiry centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election.

Applying this principle, we conclude that Blankenship's campaign efforts had a significant and disproportionate influence in placing Justice Benjamin on the case. Blankenship contributed some $3 million to unseat the incumbent and replace him with Benjamin. His contributions eclipsed the total amount spent by all other Benjamin supporters and exceeded by 300% the amount spent by Benjamin's campaign committee. App. 288a. Caperton claims Blankenship spent $1 million more than the total amount spent by the campaign committees of both candidates combined. Brief for Petitioners 28.

Massey responds that Blankenship's support, while significant, did not cause Benjamin's victory. In the end the people of West Virginia elected him, and they did so based on many reasons other than Blankenship's efforts. Massey points out that every major state newspaper, but one, endorsed Benjamin. Brief for Respondents 54. It also contends that then-Justice McGraw cost himself the election by giving a speech during the campaign, a speech the opposition seized upon for its own advantage. *Ibid.*

Justice Benjamin raised similar arguments. He asserted that "the outcome of the 2004 election was due primarily to [his own] campaign's message," as well as McGraw's "devastat[ing]" speech in which he "made a number of controversial claims which became a matter of

statewide discussion in the media, on the internet, and elsewhere." \_\_\_ W. Va., at \_\_\_, and n. 29, \_\_\_ S. E. 2d, at \_\_\_, and n. 29; App. 673a, 674a, and n. 29; see also \_\_\_ W. Va., at \_\_\_–\_\_\_, and nn. 35–39, \_\_\_ S. E. 2d, at \_\_\_–\_\_\_, and nn. 35–39; App. 677a–680a, and nn. 35–39.

Whether Blankenship's campaign contributions were a necessary and sufficient cause of Benjamin's victory is not the proper inquiry. Much like determining whether a judge is actually biased, proving what ultimately drives the electorate to choose a particular candidate is a difficult endeavor, not likely to lend itself to a certain conclusion. This is particularly true where, as here, there is no procedure for judicial factfinding and the sole trier of fact is the one accused of bias. Due process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Tumey*, *supra,* at 532. In an election decided by fewer than 50,000 votes (382,036 to 334,301), see \_\_\_ W. Va., at \_\_\_, \_\_\_ S. E. 2d, at \_\_\_; App. 677a, Blankenship's campaign contributions—in comparison to the total amount contributed to the campaign, as well as the total amount spent in the election— had a significant and disproportionate influence on the electoral outcome. And the risk that Blankenship's influence engendered actual bias is sufficiently substantial that it "must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow*, *supra,* at 47.

The temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is also critical. It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice. The $50 million adverse jury verdict had been entered before the election, and the Supreme Court of Appeals was the next step once the state trial court dealt with post-trial mo-

tions. So it became at once apparent that, absent recusal, Justice Benjamin would review a judgment that cost his biggest donor's company $50 million. Although there is no allegation of a *quid pro quo* agreement, the fact remains that Blankenship's extraordinary contributions were made at a time when he had a vested stake in the outcome. Just as no man is allowed to be a judge in his own cause, similar fears of bias can arise when—without the consent of the other parties—a man chooses the judge in his own cause. And applying this principle to the judicial election process, there was here a serious, objective risk of actual bias that required Justice Benjamin's recusal.

Justice Benjamin did undertake an extensive search for actual bias. But, as we have indicated, that is just one step in the judicial process; objective standards may also require recusal whether or not actual bias exists or can be proved. Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Murchison*, 349 U. S., at 136. The failure to consider objective standards requiring recusal is not consistent with the imperatives of due process. We find that Blankenship's significant and disproportionate influence—coupled with the temporal relationship between the election and the pending case—""""offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true."'" *Lavoie*, 475 U. S., at 825 (quoting *Monroeville*, 409 U. S., at 60, in turn quoting *Tumey*, 273 U. S., at 532). On these extreme facts the probability of actual bias rises to an unconstitutional level.

## IV

Our decision today addresses an extraordinary situation where the Constitution requires recusal. Massey and its *amici* predict that various adverse consequences will follow from recognizing a constitutional violation here—

ranging from a flood of recusal motions to unnecessary interference with judicial elections. We disagree. The facts now before us are extreme by any measure. The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case.

It is true that extreme cases often test the bounds of established legal principles, and sometimes no administrable standard may be available to address the perceived wrong. But it is also true that extreme cases are more likely to cross constitutional limits, requiring this Court's intervention and formulation of objective standards. This is particularly true when due process is violated. See, *e.g.*, *County of Sacramento* v. *Lewis*, 523 U. S. 833, 846–847 (1998) (reiterating the due-process prohibition on "executive abuse of power . . . which shocks the conscience"); *id.*, at 858 (KENNEDY, J., concurring) (explaining that "objective considerations, including history and precedent, are the controlling principle" of this due process standard).

This Court's recusal cases are illustrative. In each case the Court dealt with extreme facts that created an unconstitutional probability of bias that "'cannot be defined with precision.'" *Lavoie*, 475 U. S., at 822 (quoting *Murchison*, 349 U. S., at 136). Yet the Court articulated an objective standard to protect the parties' basic right to a fair trial in a fair tribunal. The Court was careful to distinguish the extreme facts of the cases before it from those interests that would not rise to a constitutional level. See, *e.g.*, *Lavoie, supra*, at 825–826; *Mayberry*, 400 U. S., at 465–466; *Murchison, supra*, at 137; see also Part II, *supra*. In this case we do nothing more than what the Court has done before.

As such, it is worth noting the effects, or lack thereof, of the Court's prior decisions. Even though the standards announced in those cases raised questions similar to those that might be asked after our decision today, the Court

was not flooded with *Monroeville* or *Murchison* motions. That is perhaps due in part to the extreme facts those standards sought to address. Courts proved quite capable of applying the standards to less extreme situations.

One must also take into account the judicial reforms the States have implemented to eliminate even the appearance of partiality. Almost every State—West Virginia included—has adopted the American Bar Association's objective standard: "A judge shall avoid impropriety and the appearance of impropriety." ABA Annotated Model Code of Judicial Conduct, Canon 2 (2004); see Brief for American Bar Association as *Amicus Curiae* 14, and n. 29. The ABA Model Code's test for appearance of impropriety is "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." Canon 2A, Commentary; see also W. Va. Code of Judicial Conduct, Canon 2A, and Commentary (2009) (same).

The West Virginia Code of Judicial Conduct also requires a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Canon 3E(1); see also 28 U. S. C. §455(a) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). Under Canon 3E(1), "'[t]he question of disqualification focuses on whether an objective assessment of the judge's conduct produces a reasonable question about impartiality, not on the judge's subjective perception of the ability to act fairly.'" *State ex rel. Brown* v. *Dietrick*, 191 W. Va. 169, 174, n. 9, 444 S. E. 2d 47, 52, n. 9 (1994); see also *Liteky* v. *United States*, 510 U. S. 540, 558 (1994) (KENNEDY, J., concurring in judgment) ("[U]nder [28 U. S. C.] §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind

that a fair-minded person could not set aside when judging the dispute"). Indeed, some States require recusal based on campaign contributions similar to those in this case. See, *e.g.*, Ala. Code §§12–24–1, 12–24–2 (2006); Miss. Code of Judicial Conduct, Canon 3E(2) (2008).

These codes of conduct serve to maintain the integrity of the judiciary and the rule of law. The Conference of the Chief Justices has underscored that the codes are "[t]he principal safeguard against judicial campaign abuses" that threaten to imperil "public confidence in the fairness and integrity of the nation's elected judges." Brief for Conference of Chief Justices as *Amicus Curiae* 4, 11. This is a vital state interest:

> "Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order." *Republican Party of Minn.* v. *White*, 536 U. S. 765, 793 (2002) (KENNEDY, J., concurring).

It is for this reason that States may choose to "adopt recusal standards more rigorous than due process requires." *Id.*, at 794; see also *Bracy* v. *Gramley*, 520 U. S. 899, 904 (1997) (distinguishing the "constitutional floor" from the ceiling set "by common law, statute, or the professional standards of the bench and bar").

"The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today." *Lavoie*, *supra*, at 828. Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will

be resolved without resort to the Constitution. Application of the constitutional standard implicated in this case will thus be confined to rare instances.

\*     \*     \*

The judgment of the Supreme Court of Appeals of West Virginia is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–22

———————

## HUGH M. CAPERTON, ET AL., PETITIONERS *v.* A. T. MASSEY COAL COMPANY, INC., ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

[June 8, 2009]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

I, of course, share the majority's sincere concerns about the need to maintain a fair, independent, and impartial judiciary—and one that appears to be such. But I fear that the Court's decision will undermine rather than promote these values.

Until today, we have recognized exactly two situations in which the Federal Due Process Clause requires disqualification of a judge: when the judge has a financial interest in the outcome of the case, and when the judge is trying a defendant for certain criminal contempts. Vaguer notions of bias or the appearance of bias were never a basis for disqualification, either at common law or under our constitutional precedents. Those issues were instead addressed by legislation or court rules.

Today, however, the Court enlists the Due Process Clause to overturn a judge's failure to recuse because of a "probability of bias." Unlike the established grounds for disqualification, a "probability of bias" cannot be defined in any limited way. The Court's new "rule" provides no guidance to judges and litigants about when recusal will be constitutionally required. This will inevitably lead to an increase in allegations that judges are biased, however groundless those charges may be. The end result will do

far more to erode public confidence in judicial impartiality than an isolated failure to recuse in a particular case.

## I

There is a "presumption of honesty and integrity in those serving as adjudicators." *Withrow* v. *Larkin*, 421 U. S. 35, 47 (1975). All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise. See *Republican Party of Minn.* v. *White*, 536 U. S. 765, 796 (2002) (KENNEDY, J., concurring) ("We should not, even by inadvertence, 'impute to judges a lack of firmness, wisdom, or honor'" (quoting *Bridges* v. *California*, 314 U. S. 252, 273 (1941))). We have thus identified only *two* situations in which the Due Process Clause requires disqualification of a judge: when the judge has a financial interest in the outcome of the case, and when the judge is presiding over certain types of criminal contempt proceedings.

It is well established that a judge may not preside over a case in which he has a "direct, personal, substantial pecuniary interest." *Tumey* v. *Ohio*, 273 U. S. 510, 523 (1927). This principle is relatively straightforward, and largely tracks the longstanding common-law rule regarding judicial recusal. See Frank, Disqualification of Judges, 56 Yale L. J. 605, 609 (1947) ("The common law of disqualification . . . was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else"). For example, a defendant's due process rights are violated when he is tried before a judge who is "paid for his service only when he convicts the defendant." *Tumey, supra,* at 531; see also *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813, 824 (1986) (recusal required when the judge's decision in a related case "had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case"); *Connally* v. *Georgia*, 429 U. S. 245, 250 (1977) (*per curiam*).

It may also violate due process when a judge presides over a criminal contempt case that resulted from the defendant's hostility towards the judge. In *Mayberry* v. *Pennsylvania*, 400 U. S. 455 (1971), the defendant directed a steady stream of expletives and *ad hominem* attacks at the judge throughout the trial. When that defendant was subsequently charged with criminal contempt, we concluded that he "should be given a public trial before a judge other than the one reviled by the contemnor." *Id.*, at 466; see also *Taylor* v. *Hayes*, 418 U. S. 488, 501 (1974) (a judge who had "become embroiled in a running controversy" with the defendant could not subsequently preside over that defendant's criminal contempt trial).

Our decisions in this area have also emphasized when the Due Process Clause does *not* require recusal:

> "All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." *Tumey*, *supra*, at 523; see also *Lavoie*, *supra*, at 820.

Subject to the two well-established exceptions described above, questions of judicial recusal are regulated by "common law, statute, or the professional standards of the bench and bar." *Bracy* v. *Gramley*, 520 U. S. 899, 904 (1997).

In any given case, there are a number of factors that could give rise to a "probability" or "appearance" of bias: friendship with a party or lawyer, prior employment experience, membership in clubs or associations, prior speeches and writings, religious affiliation, and countless other considerations. We have never held that the Due Process Clause requires recusal for any of these reasons, even though they could be viewed as presenting a "probability of bias." Many state *statutes* require recusal based

on a probability or appearance of bias, but "that alone would not be sufficient basis for imposing a *constitutional* requirement under the Due Process Clause." *Lavoie*, *supra*, at 820 (emphasis added). States are, of course, free to adopt broader recusal rules than the Constitution requires—and every State has—but these developments are not continuously incorporated into the Due Process Clause.

## II

In departing from this clear line between when recusal is constitutionally required and when it is not, the majority repeatedly emphasizes the need for an "objective" standard. *Ante*, at 1, 6, 9, 11–18. The majority's analysis is "objective" in that it does not inquire into Justice Benjamin's motives or decisionmaking process. But the standard the majority articulates—"probability of bias"—fails to provide clear, workable guidance for future cases. At the most basic level, it is unclear whether the new probability of bias standard is somehow limited to financial support in judicial elections, or applies to judicial recusal questions more generally.

But there are other fundamental questions as well. With little help from the majority, courts will now have to determine:

1. How much money is too much money? What level of contribution or expenditure gives rise to a "probability of bias"?

2. How do we determine whether a given expenditure is "disproportionate"? Disproportionate *to what*?

3. Are independent, non-coordinated expenditures treated the same as direct contributions to a candidate's campaign? What about contributions to independent out-

side groups supporting a candidate?

4.  Does it matter whether the litigant has contributed to other candidates or made large expenditures in connection with other elections?

5.  Does the amount at issue in the case matter? What if this case were an employment dispute with only $10,000 at stake? What if the plaintiffs only sought non-monetary relief such as an injunction or declaratory judgment?

6.  Does the analysis change depending on whether the judge whose disqualification is sought sits on a trial court, appeals court, or state supreme court?

7.  How long does the probability of bias last? Does the probability of bias diminish over time as the election recedes? Does it matter whether the judge plans to run for reelection?

8.  What if the "disproportionately" large expenditure is made by an industry association, trade union, physicians' group, or the plaintiffs' bar? Must the judge recuse in all cases that affect the association's interests? Must the judge recuse in all cases in which a party or lawyer is a member of that group? Does it matter how much the litigant contributed to the association?

9.  What if the case involves a social or ideological issue rather than a financial one? Must a judge recuse from cases involving, say, abortion rights if he has received "disproportionate" support from individuals who feel strongly about either side of that issue? If the supporter wants to help elect judges who are "tough on

crime," must the judge recuse in all criminal cases?

10. What if the candidate draws "disproportionate" support from a particular racial, religious, ethnic, or other group, and the case involves an issue of particular importance to that group?

11. What if the supporter is not a party to the pending or imminent case, but his interests will be affected by the decision? Does the Court's analysis apply if the supporter "chooses the judge" not in *his* case, but in someone else's?

12. What if the case implicates a regulatory issue that is of great importance to the party making the expenditures, even though he has no direct financial interest in the outcome (*e.g.,* a facial challenge to an agency rulemaking or a suit seeking to limit an agency's jurisdiction)?

13. Must the judge's vote be outcome determinative in order for his non-recusal to constitute a due process violation?

14. Does the due process analysis consider the underlying merits of the suit? Does it matter whether the decision is clearly right (or wrong) as a matter of state law?

15. What if a lower court decision in favor of the supporter is affirmed on the merits on appeal, by a panel with no "debt of gratitude" to the supporter? Does that "moot" the due process claim?

16. What if the judge voted against the supporter in many other cases?

17. What if the judge disagrees with the supporter's message or tactics? What if the judge expressly *disclaims* the support of this person?

18. Should we assume that elected judges feel a "debt of hostility" towards major *opponents* of their candidacies? Must the judge recuse in cases involving individuals or groups who spent large amounts of money trying unsuccessfully to defeat him?

19. If there is independent review of a judge's recusal decision, *e.g.*, by a panel of other judges, does this completely foreclose a due process claim?

20. Does a debt of gratitude for endorsements by newspapers, interest groups, politicians, or celebrities also give rise to a constitutionally unacceptable probability of bias? How would we measure whether such support is disproportionate?

21. Does close personal friendship between a judge and a party or lawyer now give rise to a probability of bias?

22. Does it matter whether the campaign expenditures come from a party or the party's attorney? If from a lawyer, must the judge recuse in every case involving that attorney?

23. Does what is unconstitutional vary from State to State? What if particular States have a history of expensive judicial elections?

24. Under the majority's "objective" test, do we analyze the due process issue through the lens of a reasonable person, a reasonable lawyer, or a reasonable judge?

25. What role does causation play in this analysis? The Court sends conflicting signals on this point. The majority asserts that "[w]hether Blankenship's campaign contributions were a necessary and sufficient cause of Benjamin's victory is not the proper inquiry." *Ante*, at 15. But elsewhere in the opinion, the majority considers "the apparent effect such contribution had on the outcome of the election," *ante*, at 14, and whether the litigant has been able to "choos[e] the judge in his own cause," *ante*, at 16. If causation is a pertinent factor, how do we know whether the contribution or expenditure had any effect on the outcome of the election? What if the judge won in a landslide? What if the judge won primarily because of his opponent's missteps?

26. Is the due process analysis less probing for incumbent judges—who typically have a great advantage in elections—than for challengers?

27. How final must the pending case be with respect to the contributor's interest? What if, for example, the only issue on appeal is whether the court should certify a class of plaintiffs? Is recusal required just as if the issue in the pending case were ultimate liability?

28. Which cases are implicated by this doctrine? Must the case be pending at the time of the election? Reasonably likely to be brought? What about an important but unanticipated case filed shortly after the election?

29. When do we impute a probability of bias from one party to another? Does a contribution from a corporation get imputed to its executives, and vice-versa? Does a contribution or expenditure by one family member get imputed to other family members?

30. What if the election is nonpartisan? What if the election is just a yes-or-no vote about whether to retain an incumbent?

31. What type of support is disqualifying? What if the supporter's expenditures are used to fund voter registration or get-out-the-vote efforts rather than television advertisements?

32. Are contributions or expenditures in connection with a primary aggregated with those in the general election? What if the contributor supported a different candidate in the primary? Does that dilute the debt of gratitude?

33. What procedures must be followed to challenge a state judge's failure to recuse? May *Caperton* claims only be raised on direct review? Or may such claims also be brought in federal district court under 42 U. S. C. §1983, which allows a person deprived of a federal right by a state official to sue for damages? If §1983 claims are available, who are the proper defendants? The judge? The whole court? The clerk of court?

34. What about state-court cases that are already closed? Can the losing parties in those cases now seek collateral relief in federal district court under §1983? What statutes of limitation should be applied to such suits?

35. What is the proper remedy? After a successful *Caperton* motion, must the parties start from scratch before the lower courts? Is any part of the lower court judgment retained?

36. Does a litigant waive his due process claim if he waits until after decision to raise it? Or would the claim only

be ripe after decision, when the judge's actions or vote suggest a probability of bias?

37. Are the parties entitled to discovery with respect to the judge's recusal decision?

38. If a judge erroneously fails to recuse, do we apply harmless-error review?

39. Does the *judge* get to respond to the allegation that he is probably biased, or is his reputation solely in the hands of the parties to the case?

40. What if the parties settle a *Caperton* claim as part of a broader settlement of the case? Does that leave the judge with no way to salvage his reputation?

These are only a few uncertainties that quickly come to mind. Judges and litigants will surely encounter others when they are forced to, or wish to, apply the majority's decision in different circumstances. Today's opinion requires state and federal judges simultaneously to act as political scientists (why did candidate X win the election?), economists (was the financial support disproportionate?), and psychologists (is there likely to be a debt of gratitude?).

The Court's inability to formulate a "judicially discernible and manageable standard" strongly counsels against the recognition of a novel constitutional right. See *Vieth* v. *Jubelirer*, 541 U. S. 267, 306 (2004) (plurality opinion) (holding political gerrymandering claims nonjusticiable based on the lack of workable standards); *id.*, at 317 (KENNEDY, J., concurring in judgment) ("The failings of the many proposed standards for measuring the burden a gerrymander imposes . . . make our intervention improper"). The need to consider these and countless other

questions helps explain why the common law and this Court's constitutional jurisprudence have never required disqualification on such vague grounds as "probability" or "appearance" of bias.

### III

### A

To its credit, the Court seems to recognize that the inherently boundless nature of its new rule poses a problem. But the majority's only answer is that the present case is an "extreme" one, so there is no need to worry about other cases. *Ante*, at 17. The Court repeats this point over and over. See *ante*, at 13 ("this is an exceptional case"); *ante*, at 16 ("On these extreme facts"); *ibid.* ("Our decision today addresses an extraordinary situation"); *ante*, at 17 ("The facts now before us are extreme by any measure"); *ante*, at 20 (Court's rule will "be confined to rare instances").

But this is just so much whistling past the graveyard. Claims that have little chance of success are nonetheless frequently filed. The success rate for certiorari petitions before this Court is approximately 1.1%, and yet the previous Term some 8,241 were filed. Every one of the "*Caperton* motions" or appeals or §1983 actions will claim that the judge is biased, or probably biased, bringing the judge and the judicial system into disrepute. And all future litigants will assert that their case is *really* the most extreme thus far.

Extreme cases often test the bounds of established legal principles. There is a cost to yielding to the desire to correct the extreme case, rather than adhering to the legal principle. That cost has been demonstrated so often that it is captured in a legal aphorism: "Hard cases make bad law."

Consider the cautionary tale of our decisions in *United States* v. *Halper*, 490 U. S. 435 (1989), and *Hudson* v.

*United States*, 522 U. S. 93 (1997). Historically, we have held that the Double Jeopardy Clause only applies to criminal penalties, not civil ones. See, *e.g.*, *Helvering* v. *Mitchell*, 303 U. S. 391, 398–400 (1938). But in *Halper*, the Court held that a civil penalty could violate the Clause if it were "overwhelmingly disproportionate to the damages [the defendant] has caused" and resulted in a "clear injustice." 490 U. S., at 446, 449. We acknowledged that this inquiry would not be an "exact pursuit," but the Court assured litigants that it was only announcing "a rule for the rare case, the case such as the one before us." *Id.*, at 449; see also *id.*, at 453 (KENNEDY, J., concurring) ("Today's holding, I would stress, constitutes an objective rule that is grounded in the nature of the sanction and the facts of the particular case").

Just eight years later, we granted certiorari in *Hudson* "because of concerns about the wide variety of novel double jeopardy claims spawned in the wake of *Halper*." 522 U. S., at 98; see also *ibid.*, n. 4. The novel claim that we had recognized in *Halper* turned out not to be so "rare" after all, and the test we adopted in that case— "overwhelmingly disproportionate"—had "proved unworkable." *Id.*, at 101–102 (internal quotation marks omitted). We thus abandoned the *Halper* rule, ruing our "ill considered" "deviation from longstanding double jeopardy principles." *Id.*, at 101.

The déjà vu is enough to make one swoon. Today, the majority again departs from a clear, longstanding constitutional rule to accommodate an "extreme" case involving "grossly disproportionate" amounts of money. I believe we will come to regret this decision as well, when courts are forced to deal with a wide variety of *Caperton* motions, each claiming the title of "most extreme" or "most disproportionate."

## B

And why is the Court so convinced that this is an extreme case? It is true that Don Blankenship spent a large amount of money in connection with this election. But this point cannot be emphasized strongly enough: Other than a $1,000 direct contribution from Blankenship, *Justice Benjamin and his campaign had no control over how this money was spent.* Campaigns go to great lengths to develop precise messages and strategies. An insensitive or ham-handed ad campaign by an independent third party might distort the campaign's message or cause a backlash against the candidate, even though the candidate was not responsible for the ads. See *Buckley* v. *Valeo*, 424 U. S. 1, 47 (1976) (*per curiam*) ("Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive"); see also Brief for Conference of Chief Justices as Amicus Curiae 27, n. 50 (citing examples of judicial elections in which independent expenditures backfired and hurt the candidate's campaign). The majority repeatedly characterizes Blankenship's spending as "contributions" or "campaign contributions," *ante*, at 1, 3, 14–17, 19, but it is more accurate to refer to them as "independent expenditures." Blankenship only "contributed" $1,000 to the Benjamin campaign.

Moreover, Blankenship's independent expenditures do not appear "grossly disproportionate" compared to other such expenditures in this very election. "And for the Sake of the Kids"—an independent group that received approximately two-thirds of its funding from Blankenship—spent $3,623,500 in connection with the election. App. 684a. But large independent expenditures were also made in support of Justice Benjamin's opponent. "Consumers for Justice"—an independent group that received large contributions from the plaintiffs' bar—spent approximately $2 million in this race. *Id.*, at 682a–683a, n. 41.

And Blankenship has made large expenditures in connection with several previous West Virginia elections, which undercuts any notion that his involvement in this election was "intended to influence the outcome" of particular pending litigation. Brief for Petitioners 29.

It is also far from clear that Blankenship's expenditures affected the outcome of this election. Justice Benjamin won by a comfortable 7-point margin (53.3% to 46.7%). Many observers believed that Justice Benjamin's opponent doomed his candidacy by giving a well-publicized speech that made several curious allegations; this speech was described in the local media as "deeply disturbing" and worse. App. 679a, n. 38. Justice Benjamin's opponent also refused to give interviews or participate in debates. All but one of the major West Virginia newspapers endorsed Justice Benjamin. Justice Benjamin just might have won because the voters of West Virginia thought he would be a better judge than his opponent. Unlike the majority, I cannot say with any degree of certainty that Blankenship "cho[se] the judge in his own cause." *Ante*, at 16. I would give the voters of West Virginia more credit than that.

\*        \*        \*

It is an old cliché, but sometimes the cure is worse than the disease. I am sure there are cases where a "probability of bias" should lead the prudent judge to step aside, but the judge fails to do so. Maybe this is one of them. But I believe that opening the door to recusal claims under the Due Process Clause, for an amorphous "probability of bias," will itself bring our judicial system into undeserved disrepute, and diminish the confidence of the American people in the fairness and integrity of their courts. I hope I am wrong.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 08–22

HUGH M. CAPERTON, ET AL., PETITIONERS *v.*
A. T. MASSEY COAL COMPANY, INC., ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
APPEALS OF WEST VIRGINIA

[June 8, 2009]

JUSTICE SCALIA, dissenting.

The principal purpose of this Court's exercise of its certiorari jurisdiction is to clarify the law. See this Court's Rule 10. As THE CHIEF JUSTICE's dissent makes painfully clear, the principal consequence of today's decision is to create vast uncertainty with respect to a point of law that can be raised in all litigated cases in (at least) those 39 States that elect their judges. This course was urged upon us on grounds that it would preserve the public's confidence in the judicial system. Brief for Petitioners 16.

The decision will have the opposite effect. What above all else is eroding public confidence in the Nation's judicial system is the perception that litigation is just a game, that the party with the most resourceful lawyer can play it to win, that our seemingly interminable legal proceedings are wonderfully self-perpetuating but incapable of delivering real-world justice. The Court's opinion will reinforce that perception, adding to the vast arsenal of lawyerly gambits what will come to be known as the *Caperton* claim. The facts relevant to adjudicating it will have to be litigated—and likewise the law governing it, which will be indeterminate for years to come, if not forever. Many billable hours will be spent in poring through volumes of campaign finance reports, and many more in contesting nonrecusal decisions through every available means.

A Talmudic maxim instructs with respect to the Scripture: "Turn it over, and turn it over, for all is therein." The Babylonian Talmud, Tractate Aboth, Ch. V, Mishnah 22 (I. Epstein ed. 1935). Divinely inspired text may contain the answers to all earthly questions, but the Due Process Clause most assuredly does not. The Court today continues its quixotic quest to right all wrongs and repair all imperfections through the Constitution. Alas, the quest cannot succeed—which is why some wrongs and imperfections have been called nonjusticiable. In the best of all possible worlds, should judges sometimes recuse even where the clear commands of our prior due process law do not require it? Undoubtedly. The relevant question, however, is whether we do more good than harm by seeking to correct this imperfection through expansion of our constitutional mandate in a manner ungoverned by any discernable rule. The answer is obvious.